# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>SC SJ HOLDINGS LLC,<br><br>    Debtor. | Chapter 11<br><br>Case No. 21-10549 (JTD) |
| Pillsbury Winthrop Shaw Pittman LLP,<br><br>    Plaintiff/Movant,<br><br>v.<br><br>SC SJ Holdings LLC,<br><br>    Defendant/Respondent. | Adv. Proc. No.: **N/A** |

## CERTIFICATION OF JUDGMENT FOR
## REGISTRATION IN ANOTHER DISTRICT

    I, clerk of the United States Bankruptcy Court, do certify that the attached judgment is a true and correct copy of the original judgment entered on July 11, 2023 [DI 1124] as it appears in the records of this Court in the jointly administered chapter 11 proceedings for SC SJ HOLDINGS, LLC and FMT SJ LLC ([Case No. 21-10549], the "Jointly Administered Proceeding"), which judgment is not subject to any stay; and that this Certification is made pursuant to the Order of the United States Bankruptcy Court dated August 10, 2023 and entered in the Jointly Administered Proceeding [DI 1145].

.

 

_____
Clerk of the Bankruptcy Court

By: _____
Deputy Clerk

_8/14/2023_____
Date

41982947.1

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: ) | Chapter 11 |
| ) | |
| SC SJ HOLDINGS LLC, *et al.*, ) | Case No. 21-10549 (JTD) |
| ) | |
| Reorganized Debtors. ) | **Re: D.I. Nos. 828 & 1013** |

## MEMORANDUM OPINION AND ORDER

Reorganized Debtors (**"Debtors"**) objected (the **"Objection"**)[1] to the Final Fee Application (the **"Fee Application"**)[2] of their counsel, Pillsbury Winthrop Shaw Pittman LLP (**"Pillsbury"**). Following argument on the Objection, I appointed a fee examiner (the **"Fee Examiner"**) to review the invoices and submit a report to the Court.[3] I have considered the Examiner's Report, along with the parties' original and supplemental briefing,[4] and conducted an independent review of the invoices. For the reasons set forth below, the Objection is sustained in part and overruled in part.

## BACKGROUND

A detailed recitation of the facts can be found in the parties' briefs. It is sufficient for resolution of the matter before me to say that the Debtors' bankruptcy, while relatively short,

---

[1] D.I. 1013, Reorganized Debtors' Objection to Pillsbury Winthrop Shaw Pittman LLP's Final Application for Compensation.
[2] D.I. 828, Final Fee Application of Pillsbury Winthrop Shaw Pittman LLP for Allowance of Compensation and Reimbursement of Expenses as Counsel to the Debtors and Debtors-in-Possession for the (I) Monthly Period of September 1, 2021 through November 8, 2021 and (II) Final Period of March 5, 2021 through November 8, 2021
[3] See D.I. 1066 at 47-48 (Transcript); 1069 (Order Appointing Fee Examiner); 1101 (Examiner's Report (the **"Examiner's Report"**)); 1118 (Supplemental Report (the **"Examiner's Supplemental Report"**)).
[4] D.I. 1048 (Pillsbury's Reply In Support of Fee Application); 1067 (Debtors' Sur-Reply In Support of Objection); 1102 (Pillsbury's Response to Examiner's Report); 1112 (Debtors' Response to Examiner's Report); 1113 (Pillsbury's Supplemental Brief).

involved extensive and contentious litigation, both here and in another forum. Over the course often months, Debtors' counsel billed $6,288,808.83 for 7,670.50 hours of work.

Nearly a year after confirmation and following the entry of an adverse judgment by an arbitration panel, Debtors sought leave to object to their counsel's final Fee Application and assert malpractice claims against their lawyers. I previously ruled that Debtors' proposed malpractice claim was barred because asserting that claim would require modification of the release and exculpation provisions contained in the confirmation order and the time to do so had passed.[5] I also ruled that Debtors could make a late-filed objection to Pillsbury's fees, making clear that any objection could not be used as an attempt to argue that Pillsbury committed legal malpractice.[6] Debtors subsequently filed the Objection, asserting that Pillsbury failed to disclose a purported conflict of interest requiring a disgorgement of all fees and questioning the reasonableness of Pillsbury's fees.

## JURISDICTION AND VENUE

This Court has jurisdiction under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## DISCUSSION

### I. Disclosure Violations

Debtors argue that the Fee Application should be denied because Pillsbury failed to make complete disclosures, as required by Section 327(a) of the Bankruptcy Code and Federal Rule of

---

[5] *See* D.I. 1001 (Order Denying Debtors' Motion to Relieve Debtors from Certain Aspects of the Confirmed Third Amended Plan) and D.I. 1097 (District Court Opinion Affirming Order).
[6] D.I. 1066 (Bench Ruling) at 43-44.

2

Bankruptcy Procedure 7014. Specifically, Debtors argue that Pillsbury represented Debtors' principal, Sam Hirbod **("Hirbod")** in his personal capacity both before and during the bankruptcy, whose interests diverged from the Debtors, creating a conflict that required informed consent, which Pillsbury did not obtain. In response, Pillsbury disclaims any personal representation and argues that its dealings with Hirbod were simply "part of the inevitable reality of representing a single-member LLC being propped up by the single owner bringing in his own outside money."[7] I agree.

The evidence before me on this issue unequivocally establishes that Pillsbury represented only the Debtors, and that Hirbod had separate counsel to represent him personally. See D.I. 1048, Exhibit 6 (Pillsbury engagement letter, stating that "[t]he Guarantors"-defined as "Sam Hirbod and Eagle Canyon Holdings, LLC"-"are not our clients under this engagement."); *id.,* Exhibit 8 (email requesting recommendations for personal lawyer for Hirbod); *id.,* Exhibit 9 (Hirbod's engagement letter with LimNexus LLP); *id.,* Exhibit 10 (deposition transcript in which LimNexus counsel states he is appearing on behalf of "Mr. Hirbod in his individual capacity," and Potter of Pillsbury stating he "represent[s] the debtors").

While Debtors point to contradictory deposition testimony as evidence, I am not persuaded that it has the significance that Debtors believe it does. The exchange on which Debtors rely took place at the deposition of Pillsbury partner Robert Grados. In response to a question regarding the basis for his statement that there was no conflict of interest, Mr. Grados testified "I believe Sam was our client."[8] But as the complete excerpt makes clear, Mr. Grados was simply elaborating on his previous statement that, as 100% equity owner of the entities engaged, Hirbod was the acting face of the client. D.I. 1067, Ex. 1 (stating "I was never party to

---

[7] D.I. 1048 at 6.
[8] D.I. 1067 at 3 and Exhibit 1.

3

any discussion regarding whether or not there was a conflict. Sam was the hundred percent equity holder of each of these entities. He was the sole equity holder. So, for all intents and purposes, other than the corporate formalities of these SPEs that were formed, it was Sam."). As the person ultimately responsible for the decisions with respect to the entities that Pillsbury represented, Pillsbury's advice was necessarily rendered through Hirbod. While such an arrangement often results in counsel referring colloquially to the principal of the client as "the client," doing so does not, by itself, create an attorney-client relationship.[9]

For these reasons, Debtors' objection to the Fee Application on the basis of a failure to disclose and a conflict of interest is overruled.

II. **Reasonableness of Fees**

Debtors next challenge the reasonableness of Pillsbury's fees. "The question of what fees should be awarded to professionals hired to assist with a bankruptcy or management of a bankrupt estate is governed by 11 U.S.C. § 330." *Zolfo, Cooper & Co. v. Sunbeam-Oster Co.,* 50 F.3d 253, 257-58 (3d Cir. 1995). Section 330 provides that a "court may award to a ... professional person employed under section 327 or 1103 of this title, or to the debtor's attorney . . . reasonable compensation for actual, necessary services rendered[.]. 11 U.S.C. § 330(a)(l). "In determining the amount of reasonable compensation to be awarded ... , the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including-:

    (A) the time spent on such services;
    (B) the rates charged for such services;
    (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title [11 USCS §§ 101 et seq.];

---

[9] Debtors do argue that Hirbod had an implied attorney-client relationship with Pillsbury, but the evidence submitted in support of this argument was excluded. See D.I. 1013 (Debtors' Objection); D.I. 1066 (Bench Ruling) at 47-48.

4

    **(D)** whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;
    **(E)** with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and
    **(F)** whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title [11 USCS §§ 101 et seq.].

11 U.S.C. § 330(a)(3).

"In employing the fee setting criteria of Section 330(a), the bankruptcy judge is accorded wide discretion." *Financial Corp. of Am.,* 114 B.R. 221,224 (9th Cir. B.A.P. 1990); *see also In re C & A Enters., Inc.,* 132 B.R. 303,307 (Bankr. W.D. Pa. 1991) ("The bankruptcy court has the independent authority and responsibility to determine the reasonableness of compensation."). "At least in part, the bankruptcy court's broad discretion is due to the fact that 'no matter how close the court comes to an objective determination of a reasonable fee, [the fee determination] is still, in the final analysis, a substantially subjective exercise.'" *Staiano v. Cain (In re Lan Assocs. XL L.P.),* 192 F.3d 109, 122 (3d Cir. 1999) (quoting *In re Garland Corp.,* 8 B.R. 826, 831 (Bankr. D. Mass. 1981)). "On its own initiative, the court may 'award compensation that is less than the amount of compensation that is requested.'" *In re Klika,* No. 05-10707 (MFW), 2008 Bankr. LEXIS 462, at *16 (Bankr. D. Del. Feb. 29, 2008) (quoting 11 U.S.C. § 330(a)(2)).

    A. **The Examiner's Report**

The Fee Examiner appointed in this case conducted a retrospective review of the fee applications submitted by Pillsbury for the purpose of determining whether they complied with the above-referenced requirements. In connection with that independent assessment, he identified three areas of concern: 1) lumped entries; 2) vague entries; and 3) mediation fees.

1. *Lumped Entries*

The Local Rules for the United States Bankruptcy Court for the District of Delaware (the **"Local Rules"**) prohibit the "lumping" of time entries. Del. Banla. L.R. 2016-2(d)(viii) ("Activity descriptions shall not be lumped - each activity shall have a separate description and time allotment[.]" A reviewer cannot determine the reasonableness of a task shown in an invoice when it is aggregated with other tasks, as the time spent on a task is of paramount consideration in determining reasonableness.

The Examiner identified 56 entries that improperly lumped tasks.[10] He recommended a 50% reduction of fees associated with these entries on the basis that the work was done and the nature of the retrospective fee review denied applicant earlier guidance that presumably would have resulted in fewer lumped entries in later applications.

In response, Debtors argue that the fees associated with lumped entries should be reduced at 100% because as court-appointed counsel Pillsbury is presumed to have knowledge of the local rules. Pillsbury replies that the recommended reduction is not appropriate because it fails to account for the fact that several of the entries identified by the Fee Examiner were later modified by Pillsbury at the Court's request.[11] Additionally, they argue, many of the lumped entries involve work done in or around trial, which Pillsbury already discounted due to the inability to separate tasks because of the fast-paced nature of trial work, and therefore further reduction on this basis is not appropriate.

While Pillsbury did modify and resubmit 16 of the 56 lumped entries, it did not modify the remaining 40. While time entries relating to work done on trial days are often given some

---

[10] Examiner's Report, D.I. 1101 at 8 and Exhibit B.
[11] D.I. 1113, Exhibits 2 and 3.

6

leeway, there is a limit to what is reasonable and many of Pillsbury's entries far surpass that limit. For example, many of the lumped entries are by a senior attorney who instead of taking the time to separate tasks as required simply noted that he was not recording all the time spent. *See, e.g.,* D.I. 1101, Ex. B (entry for 8.0 hours that states "[w]ork on many workstreams, simultaneously, and continuously, with back to back calls and emails and analysis and writing around confirmation and the plan. [Actual time was 9.3 hours.]." This is not a method of timekeeping recognized by this Court. Accordingly, with the exception of the 16 entries that were previously amended, I will reduce the fees related to the lumped entries identified by the Fee Examiner.[12] The total reduction is for lumped entries will therefore be $284,315.33 ($394,688.36 - $110,373.03).

2. *Vagueness*

The Fee Examiner next identified a number of entries that lacked the specificity necessary to determine the reasonableness of the task. His findings with respect to vague entries are as follows:

> As has been reported by other parties in this case in the course of the instant fee objection, time entries should succinctly communicate the who, what and how much for each timekeeping activity. The time entry should also communicate the why; sometimes this can be contextual, other times it must be explicitly stated. A reviewer or the Court should be able to understand what a timekeeper did, how long it took, and why the activity was undertaken.
>
> Of note are slips that include "attention to." This is a non-specific catchall term that is meaningless upon review - it can mean anything from thinking tangentially about a topic to engaging in substantive effort on that topic. Without fulsome explanation, a reviewer will never know what activity the time entry represents. It is for this reason that such slips are routinely disallowed. *See* GSC Grp., 2012 WL 676409, at *3 (internal quotations omitted); *see also* In re Quigley Co.,

---

[12] I do not agree with the Fee Examiner's recommendation to reduce the fees by only 50%. As experienced bankruptcy counsel, Pillsbury is well aware of the prohibition against lumped billing in bankruptcy cases.
See D.I. 1048, Ex. 6. Additionally, once notified that its invoices contained improperly lumped entries, it should have taken care to ensure such entries were adjusted before submitting them for final approval.

7

500 B.R. at 365 (disallowing 50% of the fees attributable to vague entries such as those containing "follow up" and "addressing issues"). In my review, I also identified several time entries that used "follow-up" for work where the task took longer than the matter being followed-up on. As a rule of thumb, from a review standpoint, a follow-up task that takes longer than the task that triggered it is not a follow-up; it is a separate task requiring fulsome description of the task and necessity for the activity.

Other vague entries include, for example, verbiage such as *"Letter to X"*, but do not state what the letter is for or why it is necessary; *"Analyze documents filed"* - what documents and for what purpose is not known; *"Analyze letter from X"* - a letter about what and for what purpose is not known; *"Email regarding discovery"* - to whom and for what are not known; *"Correspondence with X"* - about what is not known.[13]

In response to the Fee Examiner's Report, Pillsbury argues that the purportedly vague entries are only so because they are taken out of context. When read in the context of the surrounding entries, it argues, they are sufficient. I disagree.

Even assuming that contextual information provided the missing information for all the flagged entries (it is not), that would not make them proper. It is not the Court's job to piece together entries and try to make sense of them. Each entry must be capable of evaluation on its own. Many of Pillsbury's entries are not. For example, entries that describe the task as simply "attention to diligence," include no additional information in surrounding entries to indicate what this task might entail. Additionally, while entries that state "follow-up regarding same" might make sense in some contexts, such as where preceded by an entry that implies the need for a brief follow-up task, here the "follow-up" was often much longer than the previous task, and leaves the reviewer with no idea of exactly what work was performed. *See e.g.,* D.I. 1101, Ex. A

---

[13] D.I. 1101 at 6-7.

(entry states "[m]any conferences with team and client regarding discovery matters, fact development, deposition issues, and trial preparation (2.7); follow up regarding same (5.3)").[14]

Accordingly, I will reduce the fees related to the vague entries that were identified by the Fee Examiner in the amount of $67,706.19.[15]

3. *Mediation Staffing*

The Fee Examiner next noticed an issue with respect to Pillsbury's staffing of the mediation:

> My review identified one issue with respect to staffing that does warrant attention. This relates to the mediation that occurred in early May 2021. Applicant's invoice includes a time entry from Patrick Potter which states *"Note: Agreement with S. Hirbod to only charge for 2 lawyers for the mediation."* See excerpts from Invoice 8408935 attached hereto as Exhibit C. This time entry refers to the mediation that took place starting on May 10, 2021 and ending May 12, 2021. Notwithstanding that statement, the invoice includes time entries for attorneys Patrick Potter, Robert Wallan, Dania Slim and Rahman Connelly for multiple mediation sessions *(Id,* highlighted time entries). I asked Applicant for an explanation of the staffing of this mediation. Applicant responded that the Debtors agreed in advance that Applicant would provide a discount based upon additional professionals attending, which discount was reflected in the subject invoice. The invoice includes a courtesy discount of $12,000 *(Id.,* highlighted on first page). I observe that the slips for two of the professionals, Dania Slim and Robert Wallan (one senior and one junior) for participation in these mediation sessions total $13,059.65 (see Exhibit D) and I recommend disallowance of those slips to reflect compliance with Applicant's agreement with the Debtor as to limiting staffing (leaving attorneys Potter and Connelly the remaining two participating attorneys for the mediation).
>
> For staffing issues, I recommend reduction of Applicant's fees in the amount of $13,059.65. Applicant has already provided a discount in an amount that approaches this amount ($12,000) and, like other fee examiners, I give credit for discounts already taken. For the discount to apply against my proposed reduction, however, the reduction of these slips must also occur.[16]

---

[14] This is especially the case where the first entry improperly lumps several tasks together as this example does.

[15] D.I. 1101, Ex. A. Again, I disagree with the Fee Examiner's conclusion that only a 50% reduction of fees associated with these entries is appropriate. Counsel are sophisticated bankruptcy practitioners who are well aware of the billing requirements.

[16] D.I. 1101 at 11.

9

I agree that this reduction is appropriate and will further reduce the fees requested by $1,059.65 (the $13,059.65 in fees incurred minus $12,000 discount already applied).

### B. Debtors' Objections

The Fee Examiner next addressed the issues Debtors raised in their Objection. Setting aside their arguments regarding whether certain types of work was necessary or beneficial,[17] Debtors' objections fall into three categories: 1) excessively long workdays; 2) excessive intraoffice communications; and 3) unreasonable staffing. I will address each in turn.

#### 1. *Excessively Long Workdays*

Debtors object to the Fee Application because "the data analysis of Pillsbury's invoices reveals that more than 30% of the time invoiced was for people billing more than eight hours in a single day."[18] The Fee Examiner considered this objection and concluded that it was not an appropriate basis for a reduction in this case. As he explained:

> I observed in my review several slips that evinced particularly long days - a total of twenty time entries each recording daily time greater than sixteen hours. I inquired as to the reason behind these time entries and am satisfied that these time entries occurred during times of extremely busy activity - preparation for the filing of the chapter 11 cases, preparation for trial and other key case events. I am satisfied that the context in which these extraordinarily lengthy days was appropriate, isolated, and not abusive of the process. Accordingly, I do not suggest any adjustment for extraordinarily long days.[19]

---

[17] As I noted above, Debtors arguments regarding the appropriateness of the strategies taken are an attempt to circumvent my ruling that the Debtors may not pursue malpractice claims against Pillsbury. See D.I. 1066 at 42. To the extent Debtors arguments are made in an attempt to establish that Pillsbury's fees are not "actual and necessary" as Section 330 requires, I am not persuaded. Debtors attack Pillsbury's approach to this case with the benefit of hindsight, but that is not the approach that the statute requires. See *In re Grasso,* 586 B.R. 110, 144 (Bankr. E.D. Pa. 2018) ("Generally speaking, this Court must satisfy itself that the attorney's services were actual and necessary by determining whether, if at the time services were rendered, the attorney reasonably believed such services would benefit the estate."). Debtors have put forth no evidence that would support the conclusion that any of the work performed by Pillsbury was not believed to be beneficial at the time it was undertaken. Accordingly, I find the Fee Application satisfies Section 330's requirement that the services were reasonably likely to benefit the estate and necessary to the administration of the case.
[18] D.I. 1013 at 38.
[19] D.I. 1101 at 10.

I agree with this recommendation. Long workdays are not, in and of themselves, unreasonable. It is not at all unusual to see attorneys bill significantly in excess of eight hours a day on a case at peak times, such as the days leading up to confirmation or a trial. Debtors' objection on this ground is overruled.

2. *Excessive Intraoffice Communications*

Debtors next argue that the Fee Application includes an unreasonable amount of fees for meetings and calls with each other. The Fee Examiner considered this:

> The Reorganized Debtors also raise the issue of a high volume of internal office communications. I have reviewed time entries and, while I might quibble with some of Legal Decoder's math in arriving at the numbers due to slips that aggregated internal communication with other activities, I do not disagree with the fact that there occurred numerous internal office communications. My review did not find any reason for reductions based on this activity, however. In a complex and fast-moving case with multiple case-determinative activities running in parallel, frequent communication and coordination between professionals is key_20

While I agree with the Examiner that it is not unusual for attorneys working collaboratively on a fast-moving case to need to consult with each other frequently, the Debtors raise a valid point regarding the fees amassed from such communications when the case is staffed in a "partner heavy" manner, as it was here. Accordingly, rather than address the need for a reduction specific to the intraoffice communications issue separately, I will include this in my analysis of the staffing issues, which I will turn to next.

3. *Staffing*

Debtors next argue that substantial reductions are necessary for Pillsbury's partner-heavy staffing and improper delegation of work among attorneys. Specifically, Debtors argue that of Pillsbury's requested $6.288 million in fees, a mere 10% was billed by associates or

---

[20] D.I. 1101 at 9.

11

paralegals.[21] Additionally, they argue, much of the work performed by partners and senior level attorneys was far below their paygrade and should have been performed by junior level attorneys with lower billing rates. They contend that this partner-heavy staffing resulted in much larger than average bills for things like intraoffice communications, document review, and routine filings, which make up a large portion of the case.

The Fee Examiner considered Debtors' objections, but focusing only on the work of two mid-level attorneys who he deemed more akin to senior associates than partners, concluded that no reductions were warranted for partner-heavy staffing.[22] The Fee Examiner also reviewed the time entries for all professionals and concluded that there was no reason to object to time entries on the basis of staffing professionals too senior for a given task.[23] On both of these points, I must disagree with the Fee Examiner's conclusions.[24] When viewed in total, Pillsbury's invoices reflects the firm's failure to both staff the case appropriately and ensure that work was being performed in an efficient and cost-effective manner.

While I disagree with Debtors' conclusion that 90% of the work here was done by partners, it is certainly clear that senior attorneys performed far more work in this case than is typical. According to my calculations (summarized in the chart below), 65% of the total hours billed was for work performed by attorneys with more than 10 years' experience.

---

[21] D.I. 1112 at 4. It is worth noting here that while Debtors rely in large part on the Legal Decoder report for specific data on this issue, I excluded that report as hearsay and, accordingly, have not considered it. While I have repeated some of the numbers that Debtors included in their argument for purposes of making their position on these issues clear, my conclusions with respect to staffing are based only on my review of Pillsbury's invoices and are in no way dependent upon the accuracy of any of the numbers espoused by Debtors.
[22] D.I. 1101 at 9.
[23] D.I. 1101 at 13.
[24] I do, however, agree with the Fee Examiner's conclusion that no reduction of fee is warranted for "transitory timekeepers" or timekeepers who spend only a few hours on the case. D.I. 1101 at 10-11.

## Attorney Hours According to Experience

|  | **Senior**<br><br>**20 + Years' Experience**<br><br>**(Admitted in 2000 or earlier)** | **Mid-Level**<br><br>**10 -20 Years' Experience**<br><br>**(Admitted from 2000 to 2010)** | **Junior**<br><br>**10 or Fewer Years' Experience**<br><br>**(Admitted in 2011 or later)** | **TOTAL** |
|---|---|---|---|---|
| **First Monthly** | 756.8 | 181.2 | 700.7 | **1669.9**<br>(45% senior only);<br>(56% both senior and midlevel) |
| **Second Monthly** | 407.1 | 374.1 | 315.2 | **1177.9**<br>(34% senior only);<br>(66% both senior and midlevel) |
| **Third Monthly** | 393.5 | 241.6 | 361 | **1007.4**<br>(39% senior only);<br>(63% both senior and midlevel) |
| **Fourth Monthly** | 241.8 | 233.8 | 279.1 | **767.3**<br>(32% senior only);<br>(62% both senior and midlevel) |
| **Fifth Monthly** | 343.5 | 380.2 | 383.4 | **1129.2**<br>(30% senior only);<br>(64% both senior and midlevel) |
| **Final** | 886.6 | 514.5 | 502.5 | **1918.8**<br>(46% senior only);<br>(73% both senior and midlevel) |
| **TOTAL** | 3029.3 | 1925.4 | 2541.9 | **7670.5**<br>(39% senior only);<br>(65% both senior and midlevel) |

While this is not ideal, it is not quite as dramatic of an imbalance as Debtors suggest. The difference in views perhaps arises from the group of mid-level attorneys (those with between ten and twenty years of experience), whose titles at Pillsbury vary from "Senior Attorney" to "Special Counsel" to "Partner." As is clear from the breakdown above, much of the work was performed by this mid-level group, who are often appropriately tasked with a wide range of

13

assignments. As the experience and skill-level of these attorneys do not suddenly change with a change in title, it is not appropriate to examine the invoices using only the designation an attorney is given by the firm. While there is still a larger than average amount of work being done by senior attorneys here, the fact that Pillsbury reduced its normal hourly rates for this case and that the hourly rate of some senior attorneys does not vary greatly from that charged by less experienced attorneys lessens the impact of this disparity. *See e.g.,* D.I. 471 (Special Counsel admitted in 1993 billing at nearly the same rate as Counsel admitted in 2014, with the former at $817 an hour and the latter at $805 an hour); see also *Clinicomp Int'l, Inc. v. Cerner Corp.,* 2023 U.S. Dist. LEXIS 49033, *11 (S.D. CA 2023) ("[T]he problem with CliniComp's challenge is that it fails to consider the discounted hourly rates that Cerner was paying the partners at issue. In light of those discounts, Cerner was essentially paying reasonable senior associate-level hourly rates for the work of two of three partners in this case."). Nevertheless, there are other issues with Pillsbury's staffing that warrant discussion.

It is clear from the invoices that there was little effort by Pillsbury to staff the case efficiently or ensure that work was delegated appropriately. Each task often had an excessive number of attorneys involved, particularly senior-level attorneys. Instead of breaking up the work by topic or into teams with one or two people overseeing everything, Pillsbury often had a large group of people with their hands in everything. The inefficiencies in this approach are apparent from the invoices, which show that many tasks have far more attorneys involved than is typically necessary. *See e.g.,* D.I. 764-2 at 36-41 (more than four senior attorneys involved in preparing response to document requests); D.I. 471-2 at 34-45 (seven attorneys involved in preparing opposition to lift-stay motion); D.I. 507-2 at 40-41 (six senior attorneys reviewing a single bid).

The invoices are also replete with instances of very senior attorneys (partners with more than 20 years' experience) performing tasks that would more appropriately be assigned to first year associates. *See, e.g.,* D.I. 828-2 at 20 (partner prepares outline, for another partner, of topics and issues for deposition); D.I. 828-2 at 41 (partner prepares examination questions for another partner); D.I. 764-2 at 26 (partner populating chart based on spreadsheets and data); D.I. 764-2 at 33 (partner prepares responses to document requests); D.I. 828-2 at 39 (partner tying testimony with page cites and compiling exhibits). Pillsbury's senior attorneys routinely performed tasks far below their paygrade, including hours of legal research, and they failed to utilize associates for even the most straightforward of tasks such as document review or preparation of privilege logs.

This cavalier approach to billing would be unreasonable in any case, but considering this is a firm that has at least twice had its fees reduced for similar staffing concerns, it is troubling. *See Top Jet Enterprises, Ltd. v. Kulowiec,* No. 21-MC-789, 2022 WL 1184245, at *4 (S.D.N.Y. Apr. 21, 2022) ("[T]his matter was not staffed appropriately and work was not distributed in a rational way to minimize costs. This justifies a substantial reduction in hours.") (reducing fees sought by 75%); *Jet Midwest Int'l Co. v. Jet Midwest Grp.,* No. 17-cv-06005-FJG, 2020 U.S. Dist. LEXIS 206560, at *16 (W.D. Mo. Oct. 1, 2020) ("In this case, while the court recognizes that there were complicated issues involved and a substantial amount of money is at stake, there also appears to have been an excessive amount of personnel involved and some amount of over-lawyering.") (reducing fees sought by 25%). I reiterate the conclusions of these courts, specifically with regard to Pillsbury's over-lawyering, and likewise find that an across-the-board reduction in fees is appropriate in this case. *Top Jet Enters.,* 2022 U.S. Dist. LEXIS 73337, at *14 ("The Court has broad authority to make across-the-board

15

percentage cuts in hours, as opposed to an item-by-item approach, to arrive at the reasonable hours expended.).

Taking into account that Pillsbury's hourly rates have already been reduced by 15%, I find that an additional 10% reduction in fees is appropriate.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

The Objection is SUSTAINED in part and OVERRULED in part, as set forth above; and

The Fee Application is APPROVED in the amount of $5,342,155.80, reduced from the total amount sought as follows:

| | |
|---|---|
| **Fees Sought:** | $6,288,809.83 |
| LESS Lumped Entries | -$284,315.33 |
| LESS Vague Entries | -$67,706.19 |
| LESS Mediation Fees | -$1,059.65 |
| **Total after line-item deductions:** | **$5,935,728.66** |
| LESS 10% Across-The-Board Reduction | -$593,572.86 |
| **TOTAL APPROVED** | **$5,342,155.80** |

Dated: July 11, 2023

*/s/ John T. Dorsey*
JOHN T. DORSEY, U.S.B.J.